NUMBER
13-08-00684-CR

 

COURT
OF APPEALS

 

THIRTEENTH
DISTRICT OF TEXAS

 

                                  CORPUS
CHRISTI - EDINBURG

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



MARTHA VASQUEZ,                                                                    Appellant,

 

v.

 

THE STATE OF TEXAS,                                                                
Appellee.

 

 



On
appeal from the 36th District Court

of San
Patricio County, Texas.

 

 



MEMORANDUM
OPINION

 

Before
Chief Justice Valdez and Justices Garza and Benavides

Memorandum
Opinion by Chief Justice Valdez

 

Appellant, Martha
Vasquez, was charged by indictment with one count of intentionally or knowingly
causing an injury to a child by act or omission, a first-degree felony.  See
Tex. Penal Code Ann. § 22.04(a)(1),
(c)(1), (e) (Vernon Supp. 2010).  After a trial, the jury convicted Vasquez of
the underlying offense and sentenced her to eighteen years’ in the
Institutional Division of the Texas Department of Criminal Justice with a
$2,000 fine.  By three issues, Vasquez argues that:  (1) the jury charge did
not instruct the jury on the correct mental state required to convict in this
case and, thus, caused reversible error; (2) her trial counsel provided
ineffective assistance by failing to object to the indictment and the allegedly
infirm jury charge; and (3) the evidence is insufficient to support her
conviction.  We affirm.

I.             
Background

 

This appeal pertains to the
death of two-year-old Justin Fellers.  Vasquez and her boyfriend, Brian
Fellers, were charged by indictment with the following:

MARTHA VASQUEZ and BRIAN
FELLERS, acting alone and together, on or about the 7th day of
November A.D. 2007 . . . did then and there intentionally or knowingly, by act
or omission, cause serious bodily injury to Justin Fellers, a child 14 years of
age or younger, by failing to seek medical treatment for the said Justin
Fellers for blunt force trauma, and the defendant MARTHA VASQUEZ had
assumed care, custody, or control of said child . . . .

(Emphasis in original).[1]  A San Patricio
County jury heard testimony from numerous witnesses testifying for the State,
Vasquez, and Brian over the course of five days.[2] 
The witness testimony is summarized below.


 The
 State’s Evidence


 

Justin is the
biological child of Brian and his ex-wife, Tiffany Fellers.  Justin and his
three-year-old brother, Matthew, lived with Vasquez and Brian at the time of
Justin’s death.  However, for a time, Justin and Matthew were placed with
Tiffany’s mother, Victoria Poulin, after Child Protective Services (“CPS”)
removed the children from Brian and Tiffany’s home after Tiffany allegedly left
Justin home alone.[3] 
Poulin testified at trial as to the upbringing of the children and the
relationship between Justin and Matthew.  Poulin noted that Justin was only
seven months old and very developmentally behind when he came into her care. 
Poulin recalled that Justin and Matthew had a very good relationship, that they
played well together, and that they never had a problem playing together or
with another child in the household, Tyler.  Poulin did not recall Justin
having a problem with bruising.  Poulin also testified that Vasquez called her
several times while the children were in Poulin’s custody.  Vasquez allegedly
said, “that she did not want the kids [Justin and Matthew]; she was not going
to raise those kids.  She was not raising her own daughter,[[4]] and if Brian
brought those kids, she was going to leave him.”  Vasquez also tried to
persuade Poulin to skip a scheduled child support hearing involving Justin and
Matthew.  Poulin also testified that she viewed Justin’s body at the hospital
and noticed that he had “bruises from the top of his buttocks almost to the
bottom of his knees, across both legs and a great, big welp [sic] on his back.”[5]  Poulin attended
Justin’s funeral and noticed that Vasquez appeared to be angry.  Vasquez “had
her arms crossed the whole time and just had this very angry look on her
face.”  

Kristin Shirley
testified that she babysat Justin and Matthew during the weekdays from November
2006 to September 2007, just two months before Justin’s death and while the
children were still in Poulin’s custody.  Shirley stated that Justin and
Matthew were “protective of each other” and that they played well together. 
Shirley only recalled Justin having “typical child” bruises on his “shins or
something in that area.”  Shirley did not believe that either Justin or Matthew
easily bruised.  She also did not recall seeing Justin or Matthew injuring
themselves when they were angry.    

            Stephanie Pierce, a caseworker
for Bay to Bay Early Childhood Intervention and Coastal Plains MH-MR, testified
that Vasquez called for help regarding Justin’s speech.  Pierce contacted
Vasquez and asked her about Justin’s development.  Vasquez expressed a desire
to enroll Justin in counseling services because Justin and Matthew “were having
some difficulties.”  In particular, Vasquez expressed that Justin and Matthew
“scratched and hit themselves in the face and arms.”  Pierce then visited the
Vasquez house to meet with Vasquez and the children.  Upon arriving, Vasquez
disclosed that she was having “problems with potty training,” though she did
not elaborate further on the problems.  She noted that her biological daughter
was potty trained when she was twelve months old.  Pierce expressed to Vasquez
that potty training is a very stressful time for parents and relayed that she
had been involved in investigations where parents killed their children while
trying to potty train them.  Vasquez revealed that Matthew and Justin ate a
lot.  Pierce suggested that Vasquez take the children to visit a pediatrician
and a child psychiatrist about these problems; however, Vasquez stated that the
children had not “seen a pediatrician since they had been in the custody of
[Brian]” and that “she felt she wasn’t able to take them to the pediatrician
because she was their dad’s girlfriend rather than their guardian.”  Pierce
also observed the children play together, and she noted that they appeared to
have a bond and neither child was aggressive towards the other.  Pierce did
notice that Justin had “small, circular, green, yellow; like old bruises” on
either side of his lips and his lower cheek.  Towards the end of their meeting,
Vasquez expressed a concern about CPS’s continued involvement in reviewing
Justin and Matthew’s placement.  Pierce then described a meeting she had with
Vasquez and the children on November 5, 2007, two days prior to Justin’s
death.  Pierce recalled that the boys were wearing short-sleeved shirts and
shorts; that Justin did not have any visible bruises besides a few on his face;
and that it did not appear that the boys had been abused.  When shown pictures
taken during Justin’s autopsy, Pierce testified that Justin’s facial bruises in
the pictures were worse than the bruises she saw at the November 5, 2007
meeting.  

Pierce returned to
the Vasquez house when she learned that Justin had died.  Upon arriving, she
first spoke with Angelica Vasquez, Vasquez’s younger sister.  Angelica “was
flushed and breathing hard and her speech was rapid.”  Pierce described
Angelica’s reaction to Justin’s death as “bewildered.”  Pierce did not speak to
Vasquez until the next day, when she came to the Vasquez house unannounced. 
When speaking to Vasquez, Pierce noticed that Vasquez was not crying and did
not appear emotional about Justin’s death.  Vasquez then recounted the
following to Pierce regarding what had happened the night before Justin’s
death:

She
[Vasquez] said that the morning of the [6]th they got up and followed their
regular routine, which is to get up early and get Brian to work.  And she said
that it was a regular day until about 6:00 P.M.  And she said Justin had eaten
fish sticks during mealtime and had a corn dog later and she said he just began
throwing up.  And he was taken to the potty and had to be cleaned up.  That
even while he was being cleaned, he still clung to his corn dog.  They went to
the house in Sinton[[6]]
. . . .

 

She
said that they were getting ready for bed and Justin continued to throw up.

 

When Pierce asked
Vasquez why she did not take Justin to the emergency room or to the doctor
after witnessing Justin repeatedly throw up, Vasquez said she was afraid the
hospital staff would see a bruise on Justin’s leg and would report her to CPS. 
Pierce noted that Vasquez only got emotional when talking about CPS possibly
taking her biological daughter, Fernanda, away from her.

The following day,
November 9, 2007, Vasquez called Pierce’s office and told her that Justin’s
“autopsy came back clean.  She said that there are no bruises and that they
were waiting for the toxicology report.”  Vasquez called Pierce a few days
later and told Pierce that the police were going to contact her and asked if
Pierce was aware of this.  However, Vasquez later informed Pierce that the
police said that Justin had bruises all over his body and that she was offered
a plea bargain.  Vasquez told Pierce that “she cries every day” about Justin’s
death. Both of these unsolicited calls made Pierce very uncomfortable and angry;
she felt that Vasquez was trying to manipulate the situation.  Vasquez then
called Pierce again, and Pierce testified that Vasquez seemed upset that Pierce
had spoken to the police about their interactions.   

            Thelma Gutierrez, an
investigative supervisor for CPS, testified that CPS opened its case regarding
Justin in August 2007, and closed the case in late October 2007.  When Justin
was taken to the hospital, Gutierrez was informed, and she immediately traveled
to the hospital.  When she first arrived, Gutierrez saw Vasquez and Brian and
noticed that Vasquez was neither crying nor emotional.  Gutierrez asked Vasquez
what had happened, and Vasquez told Gutierrez the same story that was later
relayed to Pierce.  Vasquez also disclosed that Justin had only vomited four
times the night before his death and that he began convulsing at 7:00 a.m. on
November 7, 2007.  Regarding the bruises that were visible when Justin was
taken to the hospital, Vasquez explained that the bruises were caused by other
kids; that Justin bruised easily; that she and Brian had stopped spanking
Justin two weeks prior to his death; and that Justin would often pinch his own
cheeks.  In speaking with Vasquez, Gutierrez was surprised that Vasquez did not
show any emotion and was “very matter-of-fact.”  Later, Gutierrez spoke with
Brian, who appeared to be emotional about Justin’s death and recounted the same
story and explanations as Vasquez.  Gutierrez then testified that after
Justin’s death, Matthew was taken to Driscoll Children’s Hospital for
examination.  The results of the examination revealed that Matthew had bruising
across his buttocks and his thighs, and he had “some circular bruising.” 
Nevertheless, Matthew was returned to the Vasquez home with a safety plan in
place; however, he was officially removed and taken into CPS custody a day
later.

            Karen Diaz, a Justice of the
Peace for Precinct 4 in San Patricio County, testified that she was dispatched
to the hospital on the morning of November 7, 2007, to determine whether an
autopsy should be conducted on Justin.  When examining Justin’s body, Judge
Diaz was surprised by the amount of bruising.  She recalled that Justin had a
bruise on the top of his head, bruises to his abdomen, bruises on his face, and
many others that were different colors.  Judge Diaz touched Justin and
determined that he had likely been dead for “more than a few hours.”  Judge
Diaz thought it was odd that Justin was wearing pants and a long-sleeved shirt
with a hood becuase the weather was quite warm on November 7.  Judge Diaz then
spoke to Vasquez and Brian in the waiting room.  Vasquez was calm and “very
matter-of-fact,” while Brian sat in the back of the room softly crying. 
Vasquez then recounted to Judge Diaz her story of what had happened.  Vasquez
noted that at some point during the morning hours of November 7, Justin began
having trouble breathing, and Vasquez picked him up, shook him, and had
Angelica call 911.  Vasquez also informed Judge Diaz that shortly after she and
Brian got custody of Justin, he began complaining about a pain in his side;
however, because Vasquez and Brian did not have insurance or Medicaid coverage,
they declined to take Justin to the doctor for examination.  Vasquez told Judge
Diaz that Justin had been hand-spanked in the past and that other children
would pick on Justin, even though “nothing out of the ordinary or unusual had
happened.”  Vasquez denied abusing Justin.      

            Angela Fellers, Brian’s
sister-in-law, stated that she babysat Justin and Matthew on occasion and that
neither Justin nor Matthew played excessively roughly with each other.  Angela
saw that the boys had a good relationship and played well together.  In
addition, Angela did not notice that Justin or Mathew bruised easily; however,
she did remember seeing bruises on Justin.  Justin had some bruises on his
face, and when Angela asked Vasquez about those bruises, Vasquez stated that
Fernanda had hit Justin with a toy.  On one occasion, Vasquez asked Angela to
watch the boys on the weekend before Halloween 2007, which Angela agreed to
do.  Vasquez told Angela to keep a close eye on Justin because he was having a
problem with falling.  Angela recalled Vasquez also telling her that Justin had
a pain in his side.  Angela told Vasquez that she should take Justin to the
doctor to examine the pain in his side and his tendency to fall, to which Vasquez
responded that she was waiting to qualify for Medicaid.  In response to this
statement, Angela told Vasquez that Driscoll Children’s Hospital in Corpus
Christi, Texas, did not require Medicaid or insurance to treat children. 
Vasquez once again responded that she was waiting to qualify for Medicaid. 
After Justin’s death, Angela was subpoenaed, and she spoke with the district
attorney’s office.  After doing so, Vasquez contacted Angela asking why she was
subpoenaed and advising her to not talk to anyone about Justin.  Angela felt
uncomfortable about Vasquez calling her and advising her to not talk to anyone
about Justin because she and Vasquez were not close.  

            Courtney Schweizer,
girlfriend to Angela’s son, testified that she was at Angela’s house for the
weekend of Halloween 2007, when Angela was babysitting Justin and Matthew. 
Schweizer watched Justin and Matthew play well together.  She believed they had
a bond.  Schweizer only recalled Justin having a bruise on his stomach and a
bruise on his head.  Schweizer recalled Vasquez telling her that Justin “would
get a lump on one side of his stomach sometimes.”  Schweizer also asked Vasquez
why she had not taken Justin to the doctor to examine his alleged problems, and
Vasquez stated that she was waiting until a bruise on Justin went away.  When
shown a picture of Justin’s condition at the time of his death, Schweizer
testified that she would have taken him to the hospital earlier.  Like Pierce
and Angela, Schweizer was also contacted by Vasquez after investigators
mentioned that they would like to talk to Schweizer.  Vasquez tried to
discourage Schweizer from talking to investigators.  Nevertheless, Schweizer
spoke with investigators, and after doing so, Brian called her and angrily
stated that it was Schweizer’s fault that Angela and several others had been
subpoenaed.  On cross-examination, Schweizer recounted an incident where
Tiffany called and threatened to kill Schweizer if she did not talk to investigators
about Justin.

            Tiffany testified about a
phone call she received from Brian regarding Justin’s condition on November 7. 
Brian told Tiffany that:

He
[Brian] was at work the day before and that he came home and [Vasquez] said
that he—that Justin had been throwing up and that she [Vasquez] just thought
[Justin] had the flu or something and that he didn’t eat his dinner.  And Brian
told me that they stayed up like all night to watch Justin and he threw up
several times and they kept giving him a bath.  And then they put him to
sleep.  And then that Brian woke up and checked on [Justin] before he went to
work and that [Vasquez] called him while he was on his way to work and said
that Justin was using the bathroom and stopped breathing.

 

Regarding the bruises that were visible
on Justin’s body on the day of his death, Tiffany stated that Brian told her
that:  “he didn’t realize the bruises were as bad as they were until he saw
them at the hospital because [Vasquez] was the one that always gave [Justin] a
bath and changed his clothes and stuff.”  Tiffany attended Justin’s funeral and
remembered seeing Vasquez with “her arms crossed and she just looked mad.” 
Tiffany never saw Vasquez crying about Justin’s death.

            Russell Kirk, an
investigator for the San Patricio County District Attorney’s Office, testified
that on November 14, 2007, he interviewed Vasquez about Justin’s death.  At
this interview, Vasquez was upset and crying.  Kirk further testified that
Brian told him that some of the bruises on Justin’s buttocks were from
spanking, and Vasquez stated that Justin’s bruises on his head were caused
while playing with other kids.  

            Courtney Greer, Angelica’s
twenty-year-old husband, and Angelica testified that they lived at the Vasquez
house with Vasquez, Brian, Justin, Matthew, Vasquez’s brother, Angel Vasquez
Jr., Fernanda, and Vasquez’s parents.  Both Greer and Angelica recalled seeing
Justin throw up at least three different times on the night before his death.  Greer
stated that Justin appeared to be only a “little uncomfortable.”  Greer
recalled hearing Brian and Vasquez say that they would take Justin to the
doctor in the morning if Justin was still not feeling well.  Angelica believed
that Justin was “normal,” though she did volunteer to stay up all night with
Justin despite her school and work responsibilities the next day.  Greer noted
that Justin drank a lot of water on the night before his death, and because
Justin was sick, both Greer and Angelica prayed for Justin to feel better. 
Greer testified that he only saw a bruise on Justin’s forehead and a scratch on
Justin’s face on the night before Justin died.  Greer stated that the scratch
was caused by Justin when he “got flustered over something” and that the bruise
was caused by Justin tripping down some stairs and hitting his head on
concrete.  

The following
morning, Vasquez brought Justin into the bathroom while Greer was showering. 
At that time, Justin was in his diaper and appeared to be limp.  Greer saw that
Justin’s eyes were open and that Justin was pale.  Angelica and Greer took
Justin to Angelica’s room and laid him on Angelica’s bed.  While Angelica and
Greer were tending to Justin, Vasquez was calling 911.  Justin was struggling
to breathe and his extremities were cold.  Greer then attempted to resuscitate
Justin.  Greer testified that he asked Angelica to bring Justin some clothes
while he was trying to breathe into Justin’s mouth.  Greer continued to breathe
into Justin’s mouth until paramedics arrived.                

            On cross-examination, Greer
acknowledged that Justin and Matthew played well together, though they
occasionally wrestled.  Greer also recalled that on the night before Justin’s
death, Vasquez and Brian gave Justin some “Mejoralitos,” which were described
as children’s Tylenol from Mexico.  Greer noted that he did not think Justin’s
condition was serious enough on the evening of November 6 to warrant taking him
to the emergency room.  Greer testified that everyone in the house was upset
about Justin’s condition.  Greer never saw Vasquez discipline the children, but
he admitted that he swatted their hands “once or twice.”

            Angelica echoed Greer’s
testimony regarding the events of November 6 and 7, though she did note that
Vasquez and Brian did not appear to be worried that Justin was throwing up
repeatedly the night before his death.  She later contradicted her testimony
and stated that Vasquez appeared to be worried about Justin’s throwing up. 
Angelica recalled that most of Justin’s vomit was clear.  Angelica testified
that she was worried about Justin’s condition throughout the whole ordeal. 
Regarding the disciplining of Justin and Matthew, Angelica recalled that Brian
spanked the children and that Vasquez would threaten the children by saying,
“[i]f you keep on being bad, your dad is going to spank you.”  Angelica
remembered seeing Justin scratch himself when he would get mad.  Angelica
stated that on November 6, Justin did not have most of the bruises that were
observed at the hospital the next day.  

Angel Vasquez Jr.,
Vasquez’s brother, stated that Justin was breathing normally on the morning of
November 7, when 911 was called.  Angel Jr. testified that Vasquez was trying
to potty train Justin at the time of his death and that Justin was having a
hard time with the training.  Angel Jr. recalled seeing a bruise on Justin’s
face prior to his death, but he denied seeing any other bruises.  Shirley
Fellers, Brian’s mother, testified that Brian, Vasquez, and the children
visited on the evening of November 6, when Brian returned her lawnmower.  Only
Brian came into the house that evening, and Shirley remembered that Brian was
upset because Justin was sick.  Brian told Shirley that Justin had thrown up
and that Vasquez was cleaning up.  Brian left Shirley’s house shortly
thereafter.  Shirley saw Brian and Vasquez again at the hospital the next
morning.  Shirley saw Brian crying in the waiting room, but she noticed that
Vasquez was not crying.  Shirley was shocked to see the number of bruises on
Justin’s body at the hospital.  She recalled that Justin and Matthew had
visited about a week earlier and that Justin did not have any bruises at that
time.     

Marcus Menchaca, a
dispatcher with the San Patricio County Sheriff’s Office, testified that he
received two emergency calls from Vasquez on the morning of November 7.  At
approximately 7:00 a.m. on November 7, Menchaca received a call from Vasquez,
but Vasquez hung up before Menchaca could get any information from her. 
Menchaca then immediately called the phone number back, and a female voice,
later identified as Vasquez’s, answered.  Menchaca described the tone of the
female’s voice as “slightly hysterical but she wasn’t insane; she wasn’t crazy.
. . .  She was shooken [sic] up.  She sounded upset.  She sounded slightly
upset at first. . . .  She was very panicky.”  Vasquez first relayed to
Menchaca that Justin was having seizures, though Menchaca did not hear a crying
baby in the background.  Vasquez changed her story later in the conversation to
indicate that Justin was throwing up and choking.  About thirty seconds later,
Vasquez checked on Justin and told Menchaca in a monotone voice that, “Okay. 
My baby is fine.  He looks okay now.”  Menchaca was surprised by Vasquez’s
change in demeanor.  He thought that Vasquez no longer cared about Justin’s
condition.  Despite Vasquez’s assertion that Justin was okay, Menchaca
dispatched Officer Hankins and paramedics to the Vasquez house.  Menchaca did
not believe Vasquez’s statement that everything was fine; he believed that
“something [was] not right” and that Vasquez’s emergency calls were “weird.”   

Shortly after 7:00
a.m., Alex Hankins, a police officer with the Gregory Police Department,
arrived at the Vasquez house to find Justin “lying on a bed.  He appeared
deceased already.  The skin was grayish looking, his eyes opened partially—he
looked real stiff.”  Officer Hankins touched Justin’s foot, but Justin did not
move or flinch in response.  Officer Hankins waited with the family until
paramedics Steve Knight and Rachel Grumbles arrived.  Upon viewing Justin’s
naked body in the hospital, Officer Hankins noticed “a lot of marks . . . [a]
lot of bruises” on the body.  On cross-examination, Officer Hankins recalled
seeing Vasquez and Brian crying at the house; however, Officer Hankins
testified that their crying “didn’t look real.”  

Knight and Grumbles
recalled that no one in the family seemed upset or hysterical when they arrived
to treat Justin.  Knight testified that Justin:  (1) was not breathing; (2)
never responded; and (3) never made visual contact.  Moreover, Justin’s “eyes
were slightly open and they looked like they were kind of starting to dry out a
little bit,” meaning Justin had “been down for quite a while.”  Grumbles
noticed that Justin was not breathing and that he was pale.  Justin never cried
or made any noises and his eyes contained “dry mucus.”  When Knight and
Grumbles removed Justin’s shirt to give begin CPR, they observed “quite a bit
of bruising.”  Knight commented that “something didn’t feel right with this
call.”  Grumbles noted that Justin had bruises “[f]rom his head all the way
down to his feet,” which Grumbles described as the worst case of bruising that
she had seen.  

Patricia Woodruff, a
registered nurse in the North Bay Hospital emergency room, testified that she
was involved in the treatment of Justin at the hospital.  Justin was brought to
the hospital with no heartbeat or respiration.  Nurse Woodruff recognized that
Justin had significant bruising all over his body, which Vasquez told her was
caused by playing with other children.  Once Justin was pronounced dead and his
clothing was removed, Nurse Woodruff was surprised to see the extent of the
bruising.  Nurse Woodruff testified that the bruising to Justin’s face was
“suspicious” and the bruising to his buttocks was “worrisome.”  Regarding
bruising to Justin’s abdomen, Nurse Woodruff opined that “[i]t just seemed
large, like it would have been a painful thing and not—Well, it just seemed
unusual in the abdomen like that.  Not like playing around . . . .”  Nurse
Woodruff, a mother and grandmother, stated that none of her children or
grandchildren had ever sustained bruising as significant as she saw on Justin’s
body.  On cross-examination, Nurse Woodruff acknowledged that they had a
difficult time starting an IV on Justin and that Justin’s blood was not tested.

Saiad Mustafa, M.D.,
an emergency-room doctor who treated Justin at the hospital, testified that he
observed paramedics intubating Justin and giving Justin chest compressions as
Justin was brought into the emergency room.  Justin was not breathing and did
not have a heartbeat.  In an attempt to revive Justin, nurses had to use an
intra-osseous IV injected in Justin’s leg.  Dr. Mustafa commented that an
intra-osseous IV is commonly used with children because it is very difficult to
start an IV through a child’s veins because the veins are so small.  After many
unsuccessful efforts to revive Justin, Dr. Mustafa pronounced Justin dead at
7:41 a.m. on November 7, a death which Dr. Mustafa described as “suspicious.” 
Dr. Mustafa denied that any kind of infection could have caused the bruises and
abrasions found on Justin’s body at the time of his death or that Justin had
meningitis.  In addition, Dr. Mustafa testified that none of the life-saving
measures taken by medical staff could have caused the injuries to Justin’s abdomen. 
On cross-examination, however, Dr. Mustafa stated that it may have been
reasonable for Vasquez and Brian to not immediately seek medical assistance if
Justin had vomited only three or four times and had not vomited up any blood.   


            The medical examiner, Ray
Fernandez, M.D., testified that he conducted the autopsy of Justin and that he
was unable to pinpoint the exact time of Justin’s death.  Dr. Fernandez stated
that the cause of death was “blunt force abdominal injuries.”  Based on the
cause of death, Dr. Fernandez determined that Justin received the fatal injury
between twelve and seventy-two hours before his death, which would have been
between Sunday, November 4, 2007, and November 7.  Dr. Fernandez found food
contents in Justin’s stomach, which demonstrated that Justin ate between two
and four hours before his death and meant that Justin likely died sometime
during the evening hours of November 6.  Dr. Fernandez also saw that Justin
had:

a
two-inch area where there was bleeding just below the pancreas.  And in that
center of that area, there was a tear that was about a quarter of an inch tear
of that tissue.  The cavity, the belly itself, contained a large amount of
green-tan fluid.  It had 275 cc’s of fluid there.  Normally, there’s no fluid
at all free in that cavity. . . .

 

            There
was an indication that there was an inflammation going on in the abdomen, fluid
was building up in the abdomen.  There was trauma inside the belly and then
inflammation with fluid and pus that was building up in the abdomen.

 

The buildup of the fluid in Justin’s
abdominal cavity happened “over some period of time.”  As a result of this
buildup, Dr. Fernandez testified that an individual would be pale and may have
stomach pains.  According to Dr. Fernandez, once “the body can’t compensate for
that fluid loss.  Then they go into a coma, pass out.  It’s hard to arouse
them.  And then their blood pressure goes down, their respiratory, their
breathing goes down, and their heart stops.”  Dr. Fernandez disputed any
insinuations that Justin died of meningitis or that he suffered from a blood
disorder, such as sepsis.[7] 
Dr. Fernandez observed trauma to both sides of Justin’s abdomen, which was
consistent with more than one injury to Justin’s abdomen.  Dr. Fernandez
described the amount of force necessary to create the injuries observed to
Justin’s abdomen as:  “[t]his is a forceful injury.  The type of force you see
is usually from a car crash, see it from falling from a second story . . . .” 
Dr. Fernandez testified that Justin’s abdominal injuries were not consistent
with falling out of a bed, another child hitting Justin, or falling on the
handlebars of a tricycle, unless the tricycle was hit by a moving pickup
truck.  Dr. Fernandez then noted that Justin had “numerous abrasions, numerous
contusions” on his body and that he had bleeding in his head “between the bone and
the scalp,” though the head trauma that Justin sustained was not a “fatal-type
injury.”  Dr. Fernandez also explained that a person cannot bruise after
death.  Regarding when the blunt-force injuries occurred, Dr. Fernandez opined
that it likely occurred between lunch and dinner of November 6.  Dr. Fernandez
also noted that Tylenol was not found in Justin’s system at the time of the
autopsy, though on cross-examination, he acknowledged that the body typically
metabolizes Tylenol within several hours.

            As a rebuttal witness, the
State called Nancy S. Harper, M.D., the medical director for the Child Abuse
Resource and Evaluation Team at the Driscoll Children’s Hospital, to testify. 
Dr. Harper noted that the bruises that Justin sustained were not consistent with
the bruising that children often sustain while playing.  Dr. Harper testified
that it appeared that many of the bruises on Justin’s face were caused by an
adult forcibly grabbing Justin’s cheeks to get his attention.  Dr. Harper noted
that had Justin been brought to the hospital for treatment sooner, his injuries
could have been treated properly and he would likely still be alive.  Dr.
Harper noticed that the bruises on his inner thighs and buttocks had linear
patterns consistent with being hit with “belts” or “looped cords.”  These
bruises were “multi-plan[a]r” and not consistent with “normal childhood
activity” but with “child abuse.”  Dr. Harper also opined that the abdominal
injuries suffered by Justin were in uncommon locations in the abdomen.  Dr.
Harper stated that Driscoll Children’s Hospital “will treat anyone regardless
of insurance status.”  

            On cross-examination, Dr.
Harper denied that all of the bruises on Justin’s body could have been caused
by the life-sustaining measures taken by paramedics and doctors in the
emergency room.  She did acknowledge, however, that some bruising in the chest
and face could occur from intubation.  Dr. Harper further testified that “[a]
tummy ache from trauma” and a “tear in the mesentery is not a virus” but rather
a very serious injury that should be rushed to the emergency room.  


 Vasquez’s
 Evidence


 

Charles Harvey, M.D.,
a retired forensic pathologist who previously worked as a pathologist in
Galveston, Texas, testified that he does not believe that the manner of
Justin’s death can be determined.  Dr. Harvey acknowledged that he based his
testimony solely on photographs taken during Justin’s autopsy.  Dr. Harvey
counted that Justin had twenty-three bruises and fourteen abrasions at the time
of his death.  Dr. Harvey explained that the bruising on Justin’s buttocks was
likely caused by spanking by a hand.  Dr. Harvey then testified that Justin
likely had a blood disorder, which caused him to bleed easily and suggested
that Justin may have had sepsis. 

Dr. Harvey denied
that the injuries to Justin’s abdomen were caused by a disease or disorder.  He
did note, however, that he did not believe that Justin’s death should be
considered a homicide.  Moreover, relying on a study conducted in the Official
Journal of the American Academy of Pediatrics, Dr. Harvey stated that
Justin’s abdominal injuries may have been caused by low-energy trauma, such as
falling on the handlebars of a tricycle.  Dr. Harvey disagreed with Dr.
Fernandez’s testimony that Justin’s abdominal injuries could only have been
caused by a “high velocity” trauma. 

John Gilbert
Glanasnik, M.D., a staff physician at the University of Alabama-Tuscaloosa,
testified that it did not appear that Justin was abused.  Dr. Glanasnik did not
believe that it was unreasonable for Vasquez and Brian to wait until the
morning of November 7 to take Justin to the doctor for treatment.  Dr.
Glanasnik concurred with Dr. Harvey’s opinion that Justin likely suffered from
a blood disorder, which caused the excessive bruising, and that Justin’s
abdominal injuries may have been caused by a “low-energy impact force to the
abdomen.”  

On cross-examination,
Dr. Glanasnik admitted that he has testified solely on behalf of defendants in
approximately thirty different trials and that he relied solely on the autopsy
photographs to arrive at his opinions.       

Angel Vasquez Sr.,
Vasquez’s father, testified that Justin and Matthew would play together and
that they would play with games, toys, and tricycles.  Angel Sr. recalled only
seeing one bruise on Justin’s cheek and one bruise on his buttocks on November
6.  Angel Sr. denied ever seeing Brian spank the children, but he did see Brian
scold Justin and Matthew.  Angel Sr. testified that he believed Justin required
medical treatment on November 6 because he appeared to be “unnourished.”  He
later recanted and stated that he did not believe that Justin should have gone
to the hospital because he did not know what was causing Justin to vomit. 
Angel Sr. admitted that he and his wife primarily raised Fernanda and a
daughter that Vasquez and Brian had subsequent to Justin’s death.     


 Procedural
 History


 

At the conclusion of
the testimony, the parties agreed on a charge to submit to the jury.  Counsel
for Vasquez did not object to the proposed charge.  In fact, Vasquez expressed
in open court that she was satisfied with the charge as submitted.  The jury
found Vasquez and Brian guilty of the charged offenses, and Vasquez was
sentenced to eighteen years’ incarceration in the Institutional Division of the
Texas Department of Criminal Justice with a $2,000 fine.  See Tex. Penal Code Ann. § 22.04(a)(1),
(c)(1).  Thereafter, Vasquez filed a motion for new trial, which
was overruled by operation of law.  See Tex. R. App. P. 21.8(a), (c); see also State v. Gutierrez,
143 S.W.3d 829, 831 (Tex. App.–Corpus Christi 2004, no pet.).  This appeal
ensued.

II.           
The Indictment and the Jury
Charge

In her first issue, Vasquez
asserts that the trial court reversibly erred by failing to sua sponte charge
the jury with an instruction limiting the specific mental state required to
convict for causing serious bodily injury to a child by omission.  Vasquez also
argues that the indictment was fundamentally defective because it failed to
allege “that [she] either knew to a reasonable certainty that the omission to
seek medical treatment would cause serious bodily injury to the child or that
she consciously intended that the omission to seek medical treatment would
cause serious bodily injury to the child”; therefore, the indictment did not
properly charge her with an offense.  In particular, Vasquez contends that
injury to a child is a result-oriented offense, which requires a mental state
that relates not to the means of committing the offense but to the result of
the conduct.   

A.   The
Language Contained in the Indictment

In the instant case,
Vasquez’s trial counsel did not file a motion to quash the indictment alleging
the infirmities that are raised on appeal.  However, in DeLeon v. State,
684 S.W.2d 774, 778 (Tex. App.–Corpus Christi 1984, no pet.) (en banc) (per
curiam), this Court held that “[i]f the defect in the charging instrument is of
such a degree as to charge no offense against the law, it is void or
fundamentally defective and such a defect may be considered for the first time
on appeal.”  Therefore, even though Vasquez did not file a motion to quash the
indictment in the trial court, we must examine the language contained in the
indictment to determine whether an offense was properly alleged.  See id.

Whether an indictment
is sufficient is a question of law that we review de novo.  See State v.
Moff, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004).  We construe an
indictment by reading it as a whole and applying practical rather than
technical considerations.  Harrison v. State, 76 S.W.3d 537, 539 (Tex.
App.–Corpus Christi 2002, no pet.) (citing Oliver v. State, 692 S.W.2d
712, 714 (Tex. Crim. App. 1985) (en banc); Soto v. State, 623 S.W.2d
938, 939 (Tex. Crim. App. 1981)).  “A written instrument is an indictment or
information under the Constitution if it accuses someone of a crime with enough
clarity and specificity to identify the penal statute under which the State
intends to prosecute, even if the instrument is otherwise defective.”  Teal
v. State, 230 S.W.3d 172, 176 (Tex. Crim. App. 2007) (internal quotations
omitted).  If the indictment 

charges
the commission of the offense in ordinary and concise language in such a manner
as to enable a person of common understanding to know what is meant, and with
that degree of certainty that will give the defendant notice of the particular
offense with which he is charged, and enable the court, on conviction, to pronounce
the proper judgment,

 

then the indictment is sufficient.  Tex. Code Crim. Proc. Ann. art. 21.11
(Vernon 2009).  Generally, a charging instrument that tracks the language of a
criminal statute is sufficiently specific to provide a defendant with notice of
a charged offense.  State v. Edmond, 933 S.W.2d 120, 128 (Tex. Crim.
App. 1996) (en banc); DeVaughn v. State, 749 S.W.2d 62, 67 (Tex. Crim.
App. 1988) (en banc); see Trevino v. State, 228 S.W.3d 729, 734 (Tex.
App.–Corpus Christi 2006, pet. ref’d).

            The indictment in this case
essentially tracks the language of the penal code for the felony offense of
injury to a child.  See Tex.
Penal Code Ann. § 22.04(a)(1).[8] 
The indictment includes some additional language regarding the means in which the
offense was committed—i.e., “by failing to seek medical treatment for the said
Justin Fellers for blunt force trauma”—and fails to specify that Vasquez could
have committed the charged offense recklessly or, in other words, with a less
culpable mental state.  Instead, the indictment alleged that Vasquez could have
only committed the charged offense “intentionally or knowingly.”  Though the
indictment does not track the language of section 22.04(a)(1) word-for-word, we
cannot say that the exclusion of the “recklessly” intent level failed to
apprise Vasquez of the charged offense.  In fact, the indictment charged that
Vasquez “intentionally or knowingly” committed the offense rather than
“recklessly,” a less culpable mental state.  

In addition, we
cannot say that the inclusion of additional language in the indictment regarding
the manner and means of committing the offense prejudiced Vasquez’s substantial
rights.  See Tex. Code Crim.
Proc. Ann. art. 21.19 (Vernon 2009) (“An indictment shall not be held
insufficient, nor shall the trial, judgment or other proceedings thereon be
affected, by reason of any defect of form which does not prejudice the
substantial rights of the defendant.”); see also Gollihar v. State, 46
S.W.3d 243, 257 (Tex. Crim. App. 2001) (holding that a variance between the
wording of the indictment and the evidence presented at trial is fatal only if
“it is material and prejudices [the defendant’s] substantial rights” and that when
reviewing the variance, we must determine whether the indictment, as written,
informed the defendant of the charge against him sufficiently to allow him to
prepare an adequate defense at trial, and whether prosecution under the alleged
deficient indictment would subject the defendant to the risk of being
prosecuted later for the same crime); Geter v. State, 779 S.W.2d 403,
405-06 (Tex. Crim. App. 1989) (concluding that if a statutory term provides for
more than one manner or means to commit the act or omission, then, upon a
timely request, the State must allege the particular manner or means it seeks
to establish).  

Here, Vasquez did not
timely request that the State allege the particular manner or means for
committing the offense.  Nevertheless, the State included the specific manner
and means to commit the offense—failure to seek medical treatment—in the
indictment.  We cannot say that the inclusion of the manner and means language precluded
Vasquez from mounting an adequate defense or subjected her to additional
prosecution for the same crime, especially in light of testimony characterizing
Justin’s abdominal injuries as the only “blunt-force trauma” that ultimately
caused his death, and testimony that, had Vasquez sought medical treatment for
Justin earlier, Justin likely would have survived his injuries.  See
Gollihar, 46 S.W.3d at 257.  In addition, the inclusion of language
addressing section 22.04(d)—the section of the injury-to-a-child statute
imposing a duty on non-parents to act reasonably in procuring, among other
things, medical care for the child—in the indictment provided notice to Vasquez
that she had a duty to provide medical treatment for Justin.  See Tex. Penal Code Ann. § 22.04(d) (“For
purposes of an omission that causes a condition described by Subsection (a)(1)
. . . the actor has assumed care, custody, or control if he has by act, words,
or course of conduct acted so as to cause a reasonable person to conclude that he
has accepted the responsibility for protection, food, shelter, and medical care
for a child . . . .”).  Based on the foregoing, we cannot
say that Vasquez’s substantial rights were harmed so as to render the
indictment insufficient.

B.   The
Language Contained in the Jury Charge

Before we closely
examine the jury charge’s language, we recognize that section 6.03 of
the penal code delineates three “conduct elements” that may be involved in a
crime:  (1) the nature of the conduct; (2) the result of the conduct; and (3)
the circumstances of the conduct.  See Tex.
Penal Code Ann. § 6.03 (Vernon 2003); see also McQueen v. State,
781 S.W.2d 600, 603 (Tex. Crim. App. 1989).  Moreover, injury to a child is a
result-oriented offense; therefore, the culpable mental state criminalized in
section 22.04 contemplates only the prohibited result—here, serious bodily
injury to Justin.  See Haggins v. State, 785 S.W.2d 827, 828 (Tex. Crim.
App. 1990); Alvarado v. State, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985);
Banks v. State, 819 S.W.2d 676, 678 (Tex. App.–San Antonio 1991, pet.
ref’d); see also Martinez v. State, No. 04-02-00491-CR, 2003 Tex. App.
LEXIS 1031, at *3 (Tex. App.–San Antonio Feb. 5, 2003, no pet.) (mem. op., not
designated for publication).  It is error not to limit the definitions of
culpable mental states in result-oriented offenses to the result of the
accused’s action.  See Ventroy v. State, 917 S.W.2d 419, 423 (Tex.
App.–San Antonio 1996, pet. ref’d) (citing Cook v. State, 884 S.W.2d
485, 491 (Tex. Crim. App. 1994)); see also Martinez, 2003 Tex. App.
LEXIS 1031, at *3.  Because section 22.04 criminalizes a result-oriented
offense, the trial court was required to limit culpable mental states in the
abstract portion and the application portion of the jury charge to the result
of the defendant’s conduct.  See Cook, 884 S.W.2d at 491; Ventroy,
917 S.W.2d at 423; Skillern v. State, 890 S.W.2d 849, 869 (Tex.
App.–Austin 1994, pet. ref’d); see also Martinez, 2003 Tex. App. LEXIS
1031, at *3.  

However, because she
did not object to the charge as submitted, Vasquez has the burden of
demonstrating egregious harm.  See Almanza v. State, 686 S.W.2d 157, 171
(Tex. Crim. App. 1984).  In analyzing whether Vasquez satisfied her burden, we
read the language of the charge in the context in which it appears, and we are
not to read the charge’s language selectively.  See Turner v. State, 805
S.W.2d 423, 430-41 (Tex. Crim. App. 1991).  Moreover, we must review the
evidence and the record as a whole to determine if there was actual, rather
than theoretical harm.  See Cook, 884 S.W.2d at 491-92; see also
Martinez, 2003 Tex. App. LEXIS 1031, at *4.  For Vasquez to obtain a
reversal for egregious harm, she must assert that the complained-of error was
“fundamental” and that she was deprived of a fair and impartial trial.  See
Almanza, 686 S.W.2d at 171; see also Stuhler v. State, 218 S.W.3d
706, 719 (Tex. Crim. App. 2007) (“Jury charge error is egregiously harmful if
it affects the very basis of the case, deprives the defendant of a valuable
right, or vitally affects a defensive theory.”); Martinez, 2003 Tex.
App. LEXIS 1031, at *4.  “The actual degree of harm must be determined in light
of the entire jury charge, the state of the evidence, including contested
issues and the weight of probative evidence, the argument of counsel[,] and any
other relevant information revealed by the record as a whole.”  Martinez,
2003 Tex. App. LEXIS 1031, at **4-5 (citing Almanza, 686 S.W.2d at 171).


On appeal, Vasquez directs
us to the abstract portion of the charge where the jury was instructed as
follows:

A person who has
assumed care, custody, or control of a child commits an offense if the person
intentionally or knowingly by omission causes to that child serious bodily
injury.

. . .

The actor has assumed
care, custody, or control if she has by act, words, or course of conduct acted
so as to cause a reasonable person to conclude that she has accepted responsibility
for protection, food, shelter, and medical care for a child.

. . .

A person acts
intentionally, or with intent, with respect to a result of his conduct when it
is his conscious objective or desire to cause the result.[[9]]

A person acts
knowingly, or with knowledge, with respect to a result of his conduct when he
is aware that his conduct is reasonably certain to cause the result.[[10]]

In
the application paragraph of the court’s charge, the jury was instructed:

Now,
bearing in mind the foregoing instructions, if you find from the evidence
beyond a reasonable doubt that on or about the 7th day of November 2007[,] in
San Patricio County, Texas, the defendant, Martha Vasquez, acting alone and
together with BRIAN FELLERS, did then and there intentionally or knowingly, by
act or omission, cause serious bodily injury to Justin Fellers, a child 14
years of age or younger, by failing to seek medical treatment for the said
Justin Fellers for blunt force trauma, and the defendant MARTHA VASQUEZ had
assumed care, custody, or control of said child, you will find the defendant
guilty as charged in the indictment.

 

            If
you do not so find, or if you have a reasonable doubt thereof, you will find
the defendant not guilty.

 

Elsewhere in the jury instructions, the
trial court told the jury that, “You are the exclusive judges of the facts . .
.of the credibility of the witnesses, and the weight to be given their
testimony, but you must be governed by the law you shall receive in these
written instructions.”  A single verdict form was submitted with the charge,
allowing the jury to either convict Vasquez of injury to a child by omission,
which the jury did, or to acquit her of the charged offense.  No objection was
made to the verdict form submitted.  

            A close reading of the jury
charge shows that the trial court limited the definitions for the applicable
culpable mental states of “intentionally” and “knowingly.”  The trial court
excluded several portions of the statutory definitions for these culpable
mental states, including portions addressing conduct-oriented offenses, and limited
the definitions to the specific culpable mental states for a result-oriented
offense.  See Tex. Penal Code
Ann. § 6.03(a), (b); see also Fellers v. State, No. 13-08-688-CR,
2010 Tex. App. LEXIS 4792, at **24-25 (Tex. App.–Corpus Christi June 24, 2010,
no pet.) (mem. op., not designated for publication).  Because the trial court
limited the definitions of the culpable mental states for a result-oriented
offense, we cannot say that the charge is erroneous.  See Tex. Penal Code Ann. § 6.03(a), (b); see
also Fellers, 2010 Tex. App. LEXIS 4792, at **24-25.  As such, we overrule
Vasquez’s first issue.   

III.          
Ineffective Assistance of
Counsel

In her second issue, Vasquez
contends that her trial counsel was ineffective for failing to object to the
allegedly erroneous jury charge that was submitted and for failing to object to
the prosecutor’s alleged misstatements of the law in closing argument.

A.  
Applicable Law

To establish
ineffective assistance of counsel, Vasquez must show:  (1) her attorney’s
representation fell below an objective standard of reasonableness; and (2)
there is a reasonable probability that, but for her attorney’s errors, the
result of the proceeding would have been different.  See Strickland v.
Washington, 466 U.S. 668, 684 (1984); Dewberry v. State, 4 S.W.3d
735, 757 (Tex. Crim. App. 1999) (holding that appellant must show a reasonable
probability that, but for counsel’s errors, the fact-finder would have had a
reasonable doubt as to appellant’s guilt); Jaynes v. State, 216 S.W.3d
839, 851 (Tex. App.–Corpus Christi 2006, no pet.).  Whether this test has been
met is to be judged on appeal by the totality of representation, not by any
isolated acts or omissions.  Jaynes, 216 S.W.3d at 851.  Vasquez has the
burden of proving ineffective assistance of counsel by a preponderance of the
evidence.  Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)
(citing Cannon v. State, 668 S.W.2d 401, 403 (Tex. Crim. App. 1984)).

Our review of
counsel’s representation is highly deferential, and we will find ineffective
assistance only if Vasquez overcomes the strong presumption that her counsel’s
conduct fell within the range of reasonable professional assistance.  See
Strickland, 466 U.S. at 689; Jaynes, 216 S.W.3d at 851.  The right
to “reasonably effective assistance of counsel” does not guarantee errorless
counsel or counsel whose competency is judged by perfect hindsight.  Saylor
v. State, 660 S.W.2d 822, 824 (Tex. Crim. App. 1983).  Moreover, the acts
or omissions that form the basis of Vasquez’s claims of ineffective assistance
must be supported by the record.  Thompson, 9 S.W.3d at 814; Jaynes,
216 S.W.3d at 851.  A silent record which provides no explanation for counsel’s
actions usually will not overcome the strong presumption of reasonable
assistance.  Thompson, 9 S.W.3d at 813-14.  To warrant reversal without
affording counsel an opportunity to explain his actions, “the challenged
conduct must be ‘so outrageous that no competent attorney would have engaged in
it.’”  Roberts v. State, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007)
(quoting Goodspeed v. State, 187 S.W.3d 390, 392 (Tex. Crim. App.
2005)).

B.  
The Jury Charge

            On
appeal, a portion of Vasquez’s ineffective assistance of counsel claim is
premised on a finding that the jury charge was erroneous and that she was
deprived of a fair and impartial trial.  Because we have concluded that the
charge was not erroneous, Vasquez has failed to establish that any alleged
ineffective assistance relating to the charge prejudiced her to such a degree
that she was deprived of a fair trial.  See Strickland, 466 U.S. at 684
(1984); Dewberry, 4 S.W.3d at 757; Jaynes, 216 S.W.3d at 851.  

C.   The
Prosecutor’s Closing Argument

Permissible jury argument
generally falls into one of four areas:  (1) summation of the evidence; (2)
reasonable deduction from the evidence; (3) an answer to the argument of
opposing counsel; or (4) a plea for law enforcement.  Brown v. State, 270
S.W.3d 564, 570 (Tex. Crim. App. 2008); Berry v. State, 233 S.W.3d 847,
859 (Tex. Crim. App. 2007).

Even
when an argument exceeds the permissible bounds of these approved areas, such
will not constitute reversible error unless, in light of the record as a whole,
the argument is extreme or manifestly improper, violative of a mandatory
statute, or injects new facts harmful to the accused into the trial proceeding.

 

Wesbrook v. State, 29
S.W.3d 103, 115 (Tex. Crim. App. 2000) (citing Todd v. State, 598 S.W.2d
286, 296-97 (Tex. Crim. App. 1980)).  “The remarks must have been a willful and
calculated effort on the part of the State to deprive appellant of a fair and
impartial trial.”  Id. (citing Cantu v. State, 939 S.W.2d 627,
633 (Tex. Crim. App. 1997)).

Nevertheless, when
analyzing any harm that may have been caused by an improper jury argument, we
examine the following factors:  (1) the severity of the misconduct (the
magnitude of the prejudicial effect of the prosecutor’s remarks); (2) measures
adopted to cure the misconduct (the efficacy of any cautionary instruction by
the judge); and (3) the certainty of conviction absent the misconduct (the
strength of the evidence supporting the conviction).  Ramon v. State,
159 S.W.3d 927, 929 (Tex. Crim. App. 2004) (citing Mosley v. State, 983
S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh’g)).

In analyzing the
State’s remarks during closing argument, we must not consider the statement in
isolation; instead, we should review the closing arguments of both parties in
order to determine the context in which the complained-of statements were
made.  See Wilson v. State, 938 S.W.2d 57, 61 (Tex. Crim. App. 1996)
(“The applicable legal standard of review is whether, in light of the record as
a whole, there is a reasonable possibility the improper argument might have
contributed to appellant’s conviction.”); see also Ozuna v. State, 199
S.W.3d 601, 613 (Tex. App.–Corpus Christi 2006, no pet.) (holding that the
complained-of jury argument is considered in light of the record as a whole).

On appeal, Vasquez
complains about the following statements made by the prosecutor during closing
argument:

What
I’m going to have to tell you; what I’m going to have to prove to you beyond a
reasonable doubt; those certain elements.  I don’t have to prove they wanted
him to die.

 

            .
. . .

 

I’m
going to tell you what I have to prove.  I have to prove that on a certain date,
here in San Pat[ricio County], that these individuals [Vasquez and Brian], then
and there, intentionally or knowingly, by act or omission, caused serious
bodily injury to Justin, a child younger than 14 years of age by failing to
seek medical treatment for blunt force trauma.  They failed to seek treatment. 
That failure is what caused [Justin’s] serious bodily injury and eventually
death.  In this case, I’ve got to prove why they have this duty, what makes
Martha Vasquez have to do this for this child.  Well, she assumed care,
custody[,] or control of him.

 

            .
. . .

 

Justin
would be here today if he had gone to the emergency room in enough time for
doctors to help him.  He would be here.  You don’t have to die from this.

 

            .
. . .

 

Whichever
way you cut it, that baby died and they waited 13 to 15 and a half hours to
call the 9-1-1 or they waited 9 to 12 hours to call 9-1-1.

 

            Now,
ladies and gentlemen, if they’re willing to wait anywhere from 9 to 15 and a
half hours to call the police after he’s died, what makes you think they were
willing to take him to the doctor before then?

 

Vasquez does not clearly and explicitly
argue why the prosecutor’s closing argument was impermissible such that her
trial counsel should have objected.  See Tex. R. App. P. 38.1(i).  We surmise from Vasquez’s appellate
brief that she believes that the prosecutor’s comments were inflammatory and
urged the jury to convict without holding the State to its burden of proving
that Vasquez intended to cause Justin serious bodily injury.  

Based on our review
of the State’s entire closing argument, we believe that the statements made by the
prosecutor were permissible in that they responded to various defensive
theories asserted and focused the jury’s attention on the evidence adduced at
trial, while discouraging the jury to speculate about evidence not offered.  See
Brown, 270 S.W.3d at 570; Berry, 233 S.W.3d at 859.  Moreover,
through her closing argument, the prosecutor informed the jury of the contents
of the indictment and informed the jurors that they could convict Vasquez by
finding that she either intended to cause serious bodily injury to Justin by
omission or was aware that her omission was reasonably certain to cause the
injury.  See Johnston v. State, 150 S.W.3d 630, 636 (Tex. App.–Austin
2004, no pet.); Dusek v. State, 978 S.W.2d 129, 134 (Tex. App.–Austin
1998, pet. ref’d).  Because we are to view the State’s entire closing argument
to determine error rather than reviewing certain statements in isolation, we
cannot say that the prosecutor’s statements were impermissible.  See Brown,
270 S.W.3d at 570; Berry, 233 S.W.3d at 859; Wilson, 938 S.W.2d
at 61; see also Ozuna, 199 S.W.3d at 613.  Therefore, an objection to
these statements likely would not have succeeded.  See Brown, 270
S.W.3d at 570; Berry, 233 S.W.3d at 859; Wilson, 938 S.W.2d at
61; see also Ozuna, 199 S.W.3d at 613.  As a result, Vasquez has not
satisfied her burden of proving that trial counsel provided ineffective
assistance by failing to object to the prosecutor’s closing argument.  See
Strickland, 466 U.S. at 684 (1984); Dewberry, 4 S.W.3d at 757; Jaynes,
216 S.W.3d at 851.  We overrule Vasquez’s second issue.

IV.         
The Sufficiency of the Evidence

In her third issue, Vasquez
argues that the evidence supporting Vasquez’s conviction is legally and
factually insufficient under the jury charge that should have been submitted. 
We disagree.

A.   Standard
of Review

The
court of criminal appeals has recently held that there is “no meaningful
distinction between the Jackson v. Virginia legal sufficiency standard
and the Clewis [v. State] factual-sufficiency standard”
and that the Jackson standard “is the only standard that a reviewing
court should apply in determining whether the evidence is sufficient to support
each element of a criminal offense that the State is required to prove beyond a
reasonable doubt.”  Brooks v. State, 323 S.W.3d 893, 902-03, 912 (Tex.
2010) (plurality opinion).  Accordingly, we review Vasquez’s claims of
evidentiary sufficiency under “a rigorous and proper application” of the Jackson
standard of review.  Id. at 906-07, 912.

Under the Jackson
standard, “the relevant question is whether, after viewing the evidence in the
light most favorable to the prosecution, any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt.”  Jackson
v. Virginia, 443 U.S. 307, 319 (1979); see Brooks, 323 S.W.3d at
898-99 (characterizing the Jackson standard as:  “Considering all of the
evidence in the light most favorable to the verdict, was a jury rationally
justified in finding guilt beyond a reasonable doubt”).  “[T]he fact[-]finder’s
role as weigher of the evidence is preserved through a legal conclusion that
upon judicial review all of the evidence is to be considered in the
light most favorable to the prosecution.”  Jackson, 443 U.S. at 319
(emphasis in original); see also Tex.
Code Crim. Proc. Ann. art. 38.04 (Vernon 1979) (“The jury, in all
cases is the exclusive judge of facts proved and the weight to be given to the
testimony . . . .”); Wesbrook, 29 S.W.3d at 111 (“The
jury is the exclusive judge of the credibility of witnesses and of the weight to
be given testimony, and it is also the exclusive province of the jury to
reconcile conflicts in the evidence.”).

Sufficiency of the
evidence is measured by the elements of the offense as defined by a
hypothetically correct jury charge.  Curry v. State, 30 S.W.3d 394, 404
(Tex. Crim. App. 2000); Adi v. State, 94 S.W.3d 124, 131 (Tex. App.–Corpus
Christi 2002, pet. ref’d).  “‘Such a charge [is] one that accurately sets out
the law, is authorized by the indictment, does not unnecessarily increase the
State’s burden of proof, or unnecessarily restrict the State’s theories of liability,
and adequately describes the particular offense for which the defendant was
tried.’”  Villarreal v. State, 286 S.W.3d 321, 327 (Tex. Crim. App.
2009) (quoting Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App.
1997)).  The law as authorized by the indictment means the statutory elements
of the charged offense as modified by the charging instrument.  See Curry,
30 S.W.3d at 404.

B.   Applicable
Law

Under the Texas Penal
Code, “[a] person commits an offense [of injury to a child] if he
intentionally, knowingly, recklessly, or with criminal negligence, by act or
intentionally, knowingly, or recklessly by omission, causes to a child . . .
serious bodily injury. . . .”  Tex.
Penal Code Ann. § 22.04(a)(1); Jefferson v. State, 189 S.W.3d
305, 312 (Tex. Crim. App. 2006).  A child is a person fourteen years of age or
younger.  Tex. Penal Code Ann. §
22.04(c)(1).  “‘Serious bodily injury’ means bodily injury that creates a
substantial risk of death or that causes death . . . .”  Id. §
1.07(a)(46) (Vernon Supp. 2010).

            “‘[A]ct or omission’
constitutes the means of committing the course of conduct element of injury to
a child.”  Jefferson, 189 S.W.3d at 312.  “Injury to a child by omission
is a ‘result of conduct’ offense.”  Williams v. State, 294 S.W.3d 674,
684 (Tex. App.–Houston [1st Dist.] 2009, pet. ref’d).  “[T]he essential element
or focus of the statute is the result of the defendant’s conduct (in this case,
serious bodily injury to a child) and not the possible combinations of conduct
that cause the result.”  Jefferson, 189 S.W.3d at 312; see Alvarado,
704 S.W.2d at 39 (stating that because the injury-to-a-child statute does not
specify the “nature of conduct,” the conduct is inconsequential to its
commission as long as “the conduct (whatever it may be) is done with the
required culpability to effect the result the Legislature has
specified”) (emphasis in original). 

            The evidence is sufficient
to support Vasquez’s conviction for injury to a child by omission under section
22.04(a) of the penal code if the State proves either that she intended to
cause the injury through her omission or that she was aware that her omission
was reasonably certain to cause the injury.  Johnston, 150 S.W.3d at 636;
Dusek, 978 S.W.2d at 134.  The jury may infer both knowledge and intent
from any facts that tend to prove the existence of these mental states,
including the defendant’s acts, words, or conduct and from the nature of the
wounds inflicted on the victim.  Hart v. State, 89 S.W.3d 61, 64 (Tex.
Crim. App. 2002).  The requisite culpable mental state may also be inferred
from the surrounding circumstances.  Ledesma v. State, 677 S.W.2d 529,
531 (Tex. Crim. App. 1984).

C.   Discussion

 

Dr. Fernandez testified that
there was “trauma to [Justin’s] abdomen, causing the tearing inside the
abdomen; causing bleeding inside the abdomen; causing the fluid and the
inflammation to build up in the abdomen.”  Dr. Fernandez opined that Justin
would have likely survived his injuries had he received medical treatment
earlier.  The evidence is clear that Vasquez did not seek medical treatment for
Justin.  Thus, a rational jury could reasonably conclude that Justin suffered
serious bodily injury as a result of Vasquez’s failure to seek medical
treatment for him.

            Dr. Fernandez also testified that
“blunt force abdominal injuries” were the cause of Justin’s death but that some
of the bruising on Justin’s face and chest could have resulted from the
life-sustaining measures taken by medical staff.  However, Dr. Mustafa noted
that Justin’s abdominal injuries could not have been caused by the medical
staff’s efforts to save Justin’s life.  Moreover, Dr. Harper testified that the
bruising on Justin’s body was “not consistent with normal childhood activity”;
rather, it was “consistent with physical abuse.”  She stated that “the majority
of Justin’s bruises are from direct impact and trauma.”

            Several witnesses testified that
Vasquez cared for Justin throughout the day of November 6, while Brian was at
work.  Furthermore, Angelica noted that Brian gave Justin a bath on the night
before his death, and when Vasquez brought Justin into the bathroom and
interrupted Greer’s shower, Justin was wearing only a diaper.  Thus, a rational
jury could reasonably conclude that Vasquez would have seen the bruises to
Justin’s lower abdomen as well as the numerous other bruises and abrasions on
Justin’s body.  Several medical experts testified that most of Justin’s bruises
were not fresh and were not caused by a blood disorder or meningitis.  A
rational jury could reasonably conclude that because Vasquez knew Justin threw
up many times from November 6-7, knew that he was sick, knew that his stomach
hurt, knew that he had bruises to his lower abdomen and other parts of his
body, and knew Justin had “labored” breathing and was “breathing real heavy
through his nose” the following morning, Vasquez knew that Justin suffered some
type of blunt-force trauma that required medical treatment.

            The record contains ample
testimony from witnesses showing that Vasquez was aware of Justin’s medical
condition and that she refused to take him to the hospital for fear that a
bruise on his body would be discovered or because she allegedly failed to
qualify for Medicaid.  In fact, when told that Driscoll Children’s Hospital in
Corpus receives all patients regardless of insurance status, Vasquez still refused
to take Justin for medical treatment.  Nevertheless, on the evening of November
6, when Justin’s condition took a turn for the worse, Greer overheard Vasquez
and Brian state that they would take Justin to the doctor “in the morning if
he’s not doing any better.”  Unfortunately, Vasquez and Brian waited too late,
as Dr. Fernandez testified that Justin likely died in the evening hours of
November 6.  In addition, Pierce testified that Vasquez told her that she would
not take Justin to have various injuries examined because “she was afraid that
hospital staff would see a bruise on [Justin’s] leg and report it to C.P.S.” 
Though this evidence supports a conclusion that Vasquez’s objective in failing
to provide medical treatment to Justin was to avoid detection of physical abuse
rather than to inflict injury upon Justin, it also shows that Vasquez was aware
of Justin’s medical condition and the need to take him to the hospital.  See
Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (noting that
attempts to conceal incriminating evidence is probative of wrongful conduct and
is also a circumstance of guilt).  Several witnesses described Justin’s
appearance on November 6 as sad and pale, yet Vasquez still declined to seek
medical treatment for Justin.  Justin’s sad and sickly appearance, stomach
ache, continuous vomiting, extensive bruising to his body, and labored
breathing on the morning of his death provide ample evidence to support the
jury’s determination that Vasquez was aware that her failure to provide medical
treatment to Justin for his blunt-force trauma injuries was reasonably certain
to cause serious bodily injury.  See Johnston, 150 S.W.3d at 636
(stating that although the evidence leads to the conclusion that defendant’s
“objective in failing to provide medical care was to avoid detection rather
than inflict injury upon [the child], it also shows that [defendant] was aware
of [the child’s] dire medical condition and the need to take him to the
hospital”); see also Guevara, 152 S.W.3d at 50 (stating that “[m]otive
is a significant circumstance indicating guilt”).  Moreover, at various points
during this case, Vasquez made inconsistent statements regarding Justin’s
physical condition.  For example, Vasquez called Pierce on November 9, 2007,
noting that Justin’s autopsy “came back clean” and that Justin had “no
bruises,” even though the autopsy pictures showed numerous bruises and
abrasions on Justin’s body.  Vasquez also had varying explanations for the
bruises on Justin’s body.  Inconsistent statements are probative of wrongful
conduct and are also a circumstance of guilt.  Guevara, 152 S.W.3d at
50.

            Viewing the evidence in the light
most favorable to the verdict, we conclude that a rational trier of fact could
have found the essential elements of serious bodily injury to a child by
omission beyond a reasonable doubt.  See Jackson, 443 U.S. at 319; see
also Brooks, 323 S.W.3d at 902-03,
912.  Thus,
we hold that there is sufficient evidence to support the jury’s verdict that
Vasquez intentionally or knowingly caused serious bodily injury to Justin by
omission.  Accordingly, we overrule Vasquez’s third issue.  

V.          
Conclusion

Having overruled all of
Vasquez’s issues on appeal, we affirm the judgment of the trial court.

                                                            

                                                                                    __________________

Rogelio Valdez

                                                                                                Chief
Justice

 

Do not publish. 

Tex. R. App.
P.
47.2(b)

Delivered and filed the 

31st day of January, 2011.














[1] In a companion
case, this Court affirmed Brian’s conviction for the same offense.  See
Fellers v. State, No. 13-08-688-CR, 2010 Tex. App. LEXIS 4792, at *1 (Tex.
App.–Corpus Christi June 24, 2010, no pet.) (mem. op., not designated for
publication).

 





[2] Vasquez and
Brian were tried together.





[3] Brian obtained
custody of Justin and Matthew from Poulin on September 20, 2007.

 





[4] At the time,
Vasquez had one biological daughter, Fernanda.

 





[5] Upon viewing
Justin’s body, Poulin asserted that Vasquez and Brian had beaten Justin to
death.  Brian allegedly responded that “he could discipline his children anyway
he wanted.”





[6] Vasquez and
Brian apparently own a house in Sinton, Texas, that they were fixing up.  On
the night before Justin’s death, the family traveled to the Sinton house and to
Brian’s parents’ house to return a lawnmower.  While traveling to these places,
Justin threw up again.





[7] Dr. Mustafa
described sepsis as “blood poisoning” where “bacteria [is] growing in the
blood.”





[8] Section
22.04(a)(1) of the penal code provides that a person commits the offense of
injury to a child “if he intentionally, knowingly, recklessly, or with criminal
negligence, by act or intentionally, knowingly, or recklessly by omission,
causes to a child, elderly individual, or disabled individual . . . serious
bodily injury.”  Tex. Penal Code Ann.
§ 22.04(a)(1) (Vernon Supp. 2010).  





[9] Section 6.03(a)
of the penal code provides that “[a] person acts intentionally, or with intent,
with respect to the nature of his conduct or to a result of his conduct when it
is his conscious objective or desire to engage in the conduct or cause the
result.”  Tex. Penal Code Ann. §
6.03(a) (Vernon 2003).  

 





[10] Section 6.03(b)
of the penal code provides that:

 

A
person acts knowingly, or with knowledge, with respect to the nature of his
conduct or to circumstances surrounding his conduct when he is aware of the
nature of his conduct or that the circumstances exist.  A person acts
knowingly, or with knowledge, with respect to a result of his conduct when he
is aware that his conduct is reasonably certain to cause the result.  

 

Id. § 6.03(b).